# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| AIG SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>LIBERTY MUTUAL FIRE INSURANCE COMPANY,<br><br>Defendant. | Case No. 2:17-cv-01260-APG-NJK<br><br>**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT**<br><br>(ECF Nos. 14, 77) |

This is a declaratory relief action in a dispute between a primary insurer, defendant Liberty Mutual Fire Insurance Company, and an excess insurer, plaintiff AIG Specialty Insurance Company. Liberty and AIG both covered a construction project at the Palazzo Hotel in Las Vegas. Approximately three years after the project was completed, maintenance personnel noticed corrosion of the steel support framing underneath the Palazzo's pools and spas located on the third and fifth floors of the hotel. An investigation determined that water leaked into the unventilated crawl space beneath the pools creating a moist and humid environment that corroded the steel framing. That framing was also inconsistent with the project's specifications, which called for cold-formed metal stud framing with G90 galvanization. Instead, the contractors used light-gauge steel finished with a primer that was not properly finished to prevent rusting. The corrosion was so significant that it reduced the load carrying capacity of the framing system, which required replacing the system.

The Palazzo's owner sued the contractors in Nevada state court for the cost of replacement. A substantial barrier to settlement of that action was a dispute between Liberty and AIG about how much each should contribute to the resolution of the claims. Liberty's policy covered $2 million per occurrence, with a $4 million general aggregate limit. Liberty tendered $2 million, contending that the property damage was the result of a single occurrence. AIG, on the

other hand, contended that there were multiple occurrences, thus triggering Liberty's $4 million limit. AIG also asserted that a contractor's rework endorsement that covered the loss at issue was not subject to the $2 million per occurrence limit in Liberty's policy and instead was subject to the $4 million limit. Because AIG's duty to indemnify is not triggered until Liberty's primary policy is exhausted, AIG contended it had no obligation to contribute funds to settle the lawsuit because the overall damages were greater than $2 million but less than $4 million.

The underlying lawsuit ultimately settled. However, this declaratory relief action between AIG and Liberty remained. The parties each moved for summary judgment. I granted AIG's motion on the issue of whether Liberty's $2 million per occurrence limit applies to the contractor's rework endorsement because I concluded Liberty's policy is ambiguous, and construing the ambiguity against the drafter, the $2 million per occurrence limit does not apply. ECF No. 103.

I believed that ended the parties' dispute, but I requested a status report to ensure that was the case. AIG contends the case is over because all of the underlying settlement falls within the contractor's rework endorsement. ECF No. 14. In contrast, Liberty contends that although I ruled the contractor's rework endorsement was subject to the $4 million policy limit, I did not make any factual findings allocating what portion of the damages to the Palazzo's pool fell within any particular coverage.

I agree with Liberty. It is theoretically possible that some of the damages to the Palazzo pool areas do not fall within the contractor's rework endorsement but would constitute property damage exceeding the $2 million per occurrence limit in Liberty's policy.[1] I therefore will address the parties' dispute in their competing summary judgment motions over whether there was a single occurrence or multiple occurrences.

---

[1] Although I agree with Liberty that this is theoretically possible, it seems an unlikely scenario given what the parties have presented thus far. It appears the damages were caused entirely by the fact that the corroded steel framing system was structurally unsound and had to be replaced with a system that did not share the same defects. However, I cannot rule as a matter of law on that question because I have not been presented with evidence showing no genuine dispute remains.

## I. ANALYSIS

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

"When there are no disputed material facts," the construction of an insurance policy is "purely a question of law." *Allstate Ins. Co. v. Fackett*, 206 P.3d 572, 575 (Nev. 2009) (en banc). I read the insurance policy "as a whole," and analyze its language "from the perspective of one untrained in law or in the insurance business." *Fourth St. Place v. Travelers Indem. Co.*, 270 P.3d 1235, 1239 (Nev. 2011) (quotations omitted), *as modified on reh'g* (May 23, 2012). I give policy terms "their plain, ordinary and popular connotations." *Id.* (quotation omitted).

If an insurance policy is ambiguous, "it will be construed against the insurer, because the insurer was the drafter of the policy. . . . Whether a term is ambiguous depends on whether it creates reasonable expectations of coverage as drafted." *Id.* (quotation omitted). Consequently, I interpret the policy "to effectuate the reasonable expectations of the insured." *Id.* (quotation omitted). In evaluating whether a policy term is ambiguous, I look at "the policy as a whole in order to give a reasonable and harmonious meaning and effect to all its provisions." *Id.* (quotation omitted).

/ / / /

Section I of the Liberty policy is entitled "Coverages." ECF No. 17-1 at 60. Coverage A is entitled "Bodily Injury and Property Damage Liability." *Id.* Coverage A provides coverage for "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Id.* "Property damage" is defined as "[p]hysical injury to tangible property . . . ." *Id.* at 82.

This coverage is subject to a $2 million per occurrence limit. *Id.* at 2, 60, 72. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 81; *see also id.* at 10 (stating that property damage "arising out of continuous or repeated exposure to substantially the same general harmful conditions will be considered as the result of one and the same 'occurrence'").

Nevada follows the "causal approach" to determine the number of occurrences. *Bish v. Guar. Nat. Ins. Co.*, 848 P.2d 1057, 1058 (Nev. 1993). Under this approach, the inquiry focuses on "the cause or causes of the injury," not on the "number, magnitude or time of the injuries." *Id.* Thus, "[a]s long as the injuries stem from one proximate cause there is a single occurrence." *Id.* (quotation omitted). Proximate cause means "any cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury complained of and without which the result would not have occurred." *Drummond v. Mid-W. Growers Co-op. Corp.*, 542 P.2d 198, 203 (1975) (quotation omitted).

In making this evaluation, the court considers factors such as how closely the events are linked in time and space and whether the events are interdependent. *Bish*, 848 P.2d at 1059. Further, "'occurrence' should be defined in such a way as to give meaning to the [insured's] connection to liability." *Washoe Cty. v. Transcon. Ins. Co.*, 878 P.2d 306, 310 (Nev. 1994). For example, in *Washoe County*, a county was sued for negligently licensing a day care center where numerous children were abused. *Id.* at 307. The Supreme Court of Nevada held there was a single occurrence despite many instances of abuse because the county "'caused' the children's injuries through its failure to act with the requisite care in the process of licensing" the day care center, and "[t]herefore, such failure must be considered the 'occurrence' for purposes of

insurance liability." *Id.* at 310. Conversely, "[w]here each injury results from an independent cause, there are a series of occurrences." *Ins. Corp. of Am. v. Rubin*, 818 P.2d 389, 391 (Nev. 1991) (quotation omitted). For example, where a physician made an independent evaluation of his patient with each visit but failed each time to diagnose a brain tumor, the Supreme Court of Nevada held there were multiple occurrences (one for each visit). *Id.* at 392.

The test is more easily stated than applied, particularly in this case. There are multiple insureds accused of negligence who are insured under the same contract. Liberty's policy states that the policy limits are "the most [Liberty] will pay regardless of the number of . . . Insureds . . . ." ECF No. 17-1 at 72. Thus, in keeping with the contracting parties' intent and expectations, I will treat the various acts of negligence as if they were committed by one insured. But that does not necessarily mean there was only one occurrence. *See United Nat'l Ins. Co. v. Assurance Co. of Am.*, No. 10-CV-1086-JAD-NJK, 2015 WL 7185453, at *9-10 (D. Nev. Nov. 12, 2015) (holding there were multiple occurrences where one contractor performed work at different units at different times subject to different construction conditions).

This case is also complicated by the fact that numerous defects and negligent acts were identified but all affected only one area of the Palazzo: the steel framing beneath its pools and spas. Thus, this is unlike cases where a contractor engaged in negligent acts that caused damage to different parts of a project, resulting in multiple occurrences. *See id.*; *Ins. Co. of Pa. v. Nat'l Fire & Marine Ins. Co.*, No. 2:11-CV-02033-PMP, 2012 WL 4482674, at *4-5 (D. Nev. Sept. 26, 2012) (holding there were multiple occurrences based on property damage caused by different negligent conduct in separate systems of the property, such as water intrusion from roof defects; safety hazards caused by negligent electrical installations; and various plumbing defects, including faulty installations of toilets, improper appliance hookups, and defects in the common area swimming pool's drain pipe).

Liberty contends there is a single occurrence because there is only cause: "the negligent failure to follow design plans and thereby use proper materials." ECF No. 77 at 2. Liberty paints with too broad a brush. Such an interpretation in the context of a complex construction project

would make almost all construction defects a single occurrence because the insurer could simply characterize them all as a failure to follow the design, a failure to exercise due care in construction, or a failure to adequately supervise subcontractors, regardless of the dissimilarities in time, space, impact to different parts of the project, or bases of liability. *See Landmark Am. Ins. Co. v. Liberty Surplus Ins. Corp.*, No. CV1210728MWFJEMX, 2014 WL 12558121, at *6 (C.D. Cal. Apr. 9, 2014) (rejecting a similar argument that a contractor's "general negligent approach to its construction projects would be the sole cause of liability for any number of negligently performed projects" because if that position were adopted, "there could rarely be multiple 'occurrences' under the policies"). Liberty's position is also too narrow. It does not address that more negligent acts were identified than selecting the wrong materials. Rather, there was faulty installation (including improper waterproofing and improper pipe and drainage installation), as well as contractors allegedly leaving trash in the crawlspaces that caused drains to clog. *See* ECF Nos. 17-6 at 11, 14; 18-2 at 13.

But AIG's position is also too broad in a different way. AIG points to all the different types of defects that were discovered, including selection of the wrong steel, improperly sealed joints around the hatches, leaks in the drain pipes, faulty installation of drain pipes, faulty installation of waterproofing, clogged drains due to trash left by the contractors, and lack of adequate ventilation in the crawlspaces. *See* ECF Nos. 17-6 at 11; 18-2 at 13. But merely showing numerous acts of negligence is not enough to show multiple occurrences. *See Bish*, 848 P.2d at 136 (holding there was a single occurrence even though the driver drove over the injured person twice).

Viewing the evidence in the light most favorable to each party on the other's summary judgment motion, neither one has shown it is entitled to judgment as a matter of law regarding the number of occurrences. While the parties have submitted two reports identifying numerous negligent acts in selection of materials, faulty installation of various aspects of the pool system, and failure to clean up, there is no opinion expressed about whether all of these defects together

are the single proximate cause of the humid environment leading to the rusting, or whether there are multiple independent causes.

For example, in *Century Surety Company v. Casino West, Inc.*, several hotel guests were found dead in their room, the victims of carbon monoxide poisoning. 99 F. Supp. 3d 1262, 1263 (D. Nev. 2015). An investigation revealed several factors that contributed to the poisoning, including a malfunctioning pool heater and inadequate ventilation of the pool equipment room, which led to the fumes being channeled into the victims' hotel room. *Id.* at 1263, 1265-66. The primary and excess insurers disputed whether there was more than one occurrence. *Id.* at 1264. The court ruled that there was a single occurrence because the "faulty heater, the missing ventilation, and the sealed vents together produced the fatal conditions." *Id.* at 1266. In that case, "the various [expert] reports [made] it clear that investigators were doubtful whether any one of the 'causes' alone would have produced the necessary amount of carbon monoxide to kill the victims. Rather, investigators emphasized the interdependence of each cause to produce the fatal conditions at issue." *Id.* at 1265-66.

In contrast, here there are no expert reports about whether the various identified defects were all necessary to produce the humid environment that corroded the steel, or whether there were independent causes. The problem is informed by hypotheticals the California Court of Appeal adopted from a treatise to illustrate when continuous or repeated exposure to substantially the same general harmful conditions results in a single occurrence or multiple occurrences:

> First, an above-ground storage tank leaks undetected for a period of time. Any damage can be said to be continuous from the initial event. Second, assume the leakage resulted from a transfer line which operates only intermittently. Whenever the transfer line is used, a tank valve leaks. In this situation, the damage is not caused by a continuous exposure to conditions, i.e., a steady leak from the faulty tank, but rather by a repeated exposure to the same conditions, i.e., the [transfer] line and the faulty valve which intermittently [leaks]. Third, [c]hange the foregoing hypothetical to include both the faulty tank and the [transfer] line with the faulty valve. If both the tank failure and the valve leakage were the result of [ ] over-pressurization, it is arguable that only one occurrence has taken place, i.e., the over-pressurization which resulted in damage. On the other hand, if the tank failure was caused, for example, by a negligent forklift driver who inadvertently punctured the tank without realizing it, while the valve malfunction was caused by the over-pressurization of the transfer line, it would seem that two occurrences have taken place, because each one resulted from different causal conditions.

*Caldo Oil Co. v. State Water Res. Control Bd.*, 44 Cal. App. 4th 1821, 1828-29 (1996) (internal quotations omitted).

Here, the damage was corrosion to the steel support system generally caused by selection of incorrect materials combined with an overly humid space allowing for rapid rusting of that system. This is similar to the oil tank over-pressurization example. Assume that the over-pressurization is caused by negligent installation and negligent pressure settings. It could be argued that regardless of the cause, the over-pressurization (or here, the humid environment combined with improper materials) is the same general harmful condition and thus a single occurrence. But Nevada law ties the determination of when there is an occurrence to the proximate cause of the injury that triggers the insured's liability. Thus it is necessary to look at what negligent acts allegedly proximately caused the over-pressurization (or humid environment). *See Landmark Am. Ins. Co.*, 2014 WL 12558121, at *5 (applying California's causal test to similar policy language and concluding the focus should be on "the specific act leading to damage, not the damage itself," and "if a single injury has multiple causes, there have been multiple occurrences").

Nevada defines proximate cause to mean a cause "without which the result would not have occurred." *Drummond*, 542 P.2d at 203 (quotation omitted).[2] Consequently, in the over-pressurized tank example, if both the negligent installation and negligent pressure settings would be necessary to cause the over-pressurization, then there would be only one occurrence. But if each independently could cause the over-pressurization, there would be two occurrences. Likewise, if, for example, selection of faulty material combined with faulty waterproofing would have caused the rusting even in the absence of the other conditions, and faulty material combined

---

[2] *See also Caldo Oil Co.*, 44 Cal. App. 4th at 1828 (stating that "[w]hen all injuries emanate from a common source or process, there is only a single occurrence for purposes of policy coverage," but "when a cause is interrupted, or when there are several autonomous causes, there are multiple 'occurrences' for purposes of determining policy limits and assessing deductibles" (quotation omitted)).

with leaks also would have caused the rusting even in the absence of other conditions, then there is more than one proximate cause, and more than one occurrence.

There are three general types of negligence identified: (1) selection of the wrong materials, (2) faulty installation of various components (waterproofing, unfinished or leaking pipes, etc.) allowing for water intrusion, and (3) failure to clean up the area leading to clogged drains. In addition, the crawlspace was not properly ventilated, although it is unclear whether this is a failure attributable to the contractors who were sued. It is clear that the selection of improper material for the steel framing was a necessary, but not sufficient, causal factor.[3] What is less clear is what additional negligent acts were also causal factors and whether they independently would have caused the rusting or whether they were interdependent (or not causally connected at all).

"In Nevada, issues of negligence and proximate cause are usually factual issues to be determined by the trier of fact." *Frances v. Plaza Pac. Equities, Inc.*, 847 P.2d 722, 724 (Nev. 1993). Because no party has shown it is entitled to judgment as a matter of law on the number of proximate causes, and thus on the number of occurrences, I deny their respective summary judgment motions on this issue.

**II. CONCLUSION**

IT IS THEREFORE ORDERED that the parties' summary judgment motions **(ECF Nos. 14, 77) are DENIED regarding the issue of the number of occurrences**.

IT IS FURTHER ORDERED that the joint proposed pretrial order is due thirty days from the date this order is entered. Alternatively, if the parties believe a settlement conference would be fruitful before filing the joint proposed pretrial order, they may file a stipulation to proceed to

---

[3] There does not appear to be any evidence that in the absence of that choice, the remedial work would have been required when it was. *See* ECF No. 18-2 at 14 (engineering report suggesting that the moist environment may have been "tolerable" for the originally planned system, but it caused severe rusting to the steel framing system used); *id.* at 9-10 (showing damage to galvanized steel in the crawlspace was "minimal" despite the humid environment, whereas non-galvanized steel was severely corroded).

a settlement conference first.  If they do so, then the joint proposed pretrial order will be due thirty days after the settlement conference if the settlement conference is unsuccessful.

DATED this 18th day of April, 2018.

> ANDREW P. GORDON
> UNITED STATES DISTRICT JUDGE